**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**

| | |
|---|---|
| **JAMES KELLY** )<br>)<br>     **Plaintiff,** )<br>)<br>**vs.** )<br>)<br>**STATE OF TENNESSEE, TENNESSEE** )<br>**WILDLIFE RESOURCES AGENCY,** )<br>**JASON MAXEDON, Executive** )<br>**Director** )<br>)<br>     **Defendants.** ) | **Case No. _____**<br>**Jury Demand** |

## COMPLAINT

Comes the Plaintiff, James Kelly ("Mr. Kelly"), by and through counsel, and brings this cause of action against the Defendants State of Tennessee and the Tennessee Wildlife Resource Agency ("TWRA") and Jason Maxedon ("Maxedon") (collectively "Defendants"). As grounds, Mr. Kelly states unto the Court as follows:

### PARTIES

1.  Plaintiff is a resident of the State of Georgia. During the events alleged in the Complaint, Mr. Kelly was a resident of the State of Tennessee.

2.  The State of Tennessee was the employer for Mr. Kelly during all relevant time periods. The State of Tennessee may be served through the State Attorney General pursuant to Tenn. R. Civ. P. 4.04.

3.  Defendant, TWRA is an agency of the State of Tennessee created by Tenn. Code Ann. § 70-1-301. The TWRA may be served through the State Attorney General pursuant to Tenn. R. Civ. P. 4.04.

1

4. Defendant Maxedon is the Executive Director of the TWRA. Maxedon began serving as interim executive director on April 29, 2022, and was named the executive director in June of 2022. In this lawsuit, Maxedon is being sued in both his individual and official capacities. He may be served at the offices for the Tennessee Wildlife Resource Agency at 5107 Edmondson Pike, Nashville, Tennessee 37220.

## VENUE AND JURISDICTION

5. This Court has jurisdiction over the claims against Defendants under 28 U.S.C. § 1332. There is complete diversity between the parties and the amount in controversy exceeds $75,000.

## INTRODUCTION

6. This lawsuit arises following the termination of Mr. Kelly's employment with the TWRA. Pursuant to Tenn. Code Ann. § 8-42-101(3)(A), Mr. Kelly's employment with the TWRA made him an employee of the State of Tennessee. All references to the TWRA herein, unless otherwise stated, refer to both the TWRA and the State of Tennessee.

7. During 2021, Mr. Kelly was part of a group of individuals at the TWRA who learned of and investigated discrepancies in the accuracy of TWRA's reported detections of chronic wasting disease ("CWD"). From 2016 until his termination, Mr. Kelly reviewed and processed all CWD diagnostic lab results with the exception of results that returned while he was on leave. During that time, nobody at the TWRA knew more about the CWD diagnostic lab results than Mr. Kelly.

8. As a Certified Wildlife Biologist, Mr. Kelly pledged to uphold The Wildlife Society's Code of Ethics, which includes, among other things, refraining from "fabrication, falsification, or suppression of results," avoiding "performing provision services for any client or

employer when such service is judged to be contrary to the Code of Ethics or detrimental to the well-being of wildlife resources and their environment," and "advising "against any action by a client or employer which violates any statute or regulation."

9. During his employment with the TWRA, he reported and was asked by his supervisors to investigate discrepancies in diagnostic lab results. Mr. Kelly's investigation revealed to the TWRA that these discrepancies were in fact erroneously reported to the public as new detections of CWD. The TWRA had the opportunity to explain and correct the errors. However, it chose not to. Its decision violated its Rules & Regulations and deliberately defrauded the public, TWRA staff, and the Kentucky Department of Fish and Wildlife, which in turn failed to protect the public health, safety and welfare of the citizens of the State of Tennessee.

10. When the TWRA instructed Mr. Kelly to remain silent about the TWRA's decision, Mr. Kelly reported his findings to the Tennessee Fish and Wildlife Commission ("TFWC") as well as interested third parties. In response, the TWRA at the direction of Jason Maxedon terminated Mr. Kelly in violation of Tenn. Code Ann. § 50-1-304 and Tenn. Code Ann. § 8-50-116.

**FACTS**

11. CWD is a fatal neurological disorder that affects members of the deer family. It is one hundred percent fatal, and there is no known treatment to cure it or vaccine to prevent it. Scientists believe that the causative agent remains infectious even after an animal dies.

12. Clinical signs of CWD appear approximately 18-24 months after infection in white-tailed deer. Death occurs approximately 4 months after the onset of clinical symptoms. Once deer

3

infected with CWD begin to show clinical symptoms from CWD, they are considered to be in the late stages of the disease process.

13.    In June of 2016, the TWRA hired Mr. Kelly as the Deer Management Program Leader. Mr. Kelly has a bachelor's degree in biology and a master's degree in wildlife management and ecology. In his role as the Deer Management Program Leader, Mr. Kelly chaired the CWD Deer Management Standing Team. He also spearheaded the development and implementation of the TWRA's first risk-based CWD surveillance plan. Under this plan, Mr. Kelly coordinated the statewide CWD surveillance, and in December of 2018, the TWRA detected the presence of CWD in Tennessee for the very first time.

14.    In response to finding CWD in December of 2018, the TWRA launched its emergency response to the discovery of CWD in deer in Tennessee. Because the clinical symptoms of CWD are consistent with other diseases common to white-tailed deer, CWD cannot be diagnosed by clinical symptoms alone. At that time, the TWRA's CWD response plan used enzyme-linked immunosorbent assay ("ELISA") to screen deer tissue samples for CWD. ELISA suspect positive results would only be considered a confirmed positive if the sample additionally tested positive using the immunohistochemistry ("IHC") technique. The TWRA documented the process of "confirmation" in its 2018 Emergency Response Plan where it stated: "[a] positive ELISA test for CWD must be confirmed via the IHC method, which measures accumulations of CWD-associated prion protein in brain and lymph node tissues." A true and correct copy of the TWRA's 2018 Emergency Response Plan is attached as Exhibit 1 to this Complaint.

15.    In December of 2018, the TWRA adopted emergency rules and regulations for Chronic Wasting Disease Zones. According to the Statement of Necessity submitted,

On December 18, 2018, Chronic Wasting Disease (CWD) was confirmed in ten (10) deer harvested by hunters in Hardeman County and Fayette County, Tennessee. To date, these are the only known cases of CWD in Tennessee. The Agency has been conducting CWD surveillance for more than 16 years, testing over 15,000 animals. There is currently no evidence that CWD is present in any other Tennessee county.

CWD is a transmissible disease that affects all cervids, including white-tailed deer and elk native to Tennessee. There is no treatment, and the disease is fatal. A misfolded protein called a prion causes the disease. Prions are nearly impossible to destroy, and they remain in the environment indefinitely. Prions are transmitted through direct animal-to-animal contact, and contact with feces, saliva, urine, contaminated environments, or infected carcass parts. Long after infected carcass remains decompose, the soil around the remains stay infectious, possibly exposing other deer.

The United States Center for Disease Control and Prevention (CDC) and the World Health Organization have reviewed available scientific data. They concluded that there is no strong evidence for the occurrence of CWD in people and that it is not known if people can get infected with CWD prions. However, the CDC recently published guidance on human handling of venison harvested from areas with CWD. The CDC recommends that hunters harvesting a cervid from a CWD endemic area submit a sample of their animal for CWD testing prior to consuming the meat. The CDC also urges hunters, to be safe as possible, to not consume animals known to be positive. As CWD spreads, more animals become infected. As more animals become infected, there is an increased risk of humans consuming infected meat.

Tennessee Code Annotated § 4-5-208 authorizes emergency rules to protect the public from an immediate danger to public safety or welfare. Title 70 requires the Agency to manage, protect, propagate and conserve all wildlife in the state. The Agency must protect the cervid population from CWD for the benefit of the public welfare. The Agency must also protect the public from the potential safety risk of consuming venison meat infected with CWD. The Agency is addressing these concerns by identifying those areas in which the risk of spreading CWD is greatest and creating CWD Management Zones; prohibiting the transport of carcasses from the greatest risk zones to reduce the risk of spreading CWD; and prohibiting individuals from feeding cervids to reduce the spread of CWD to uninfected cervids.

In order to protect Tennessee's wild cervid herds and to mitigate human health concerns, the Agency needs to take this immediate action to limit the spread of CWD.

A true and accurate copy of that statement of necessity is attached to this Complaint as

Exhibit 2.

16. The emergency rules created a chronic wasting disease management zone "established upon confirmation that a cervid has tested positive for CWD." Tenn. Comp. R. & Regs. 1660-01-34-.01 (Emergency Rule). This emergency rule expired on June 19, 2019, and a new regulation was adopted that distinguished between counties deemed "positive CWD" or "high risk CWD" upon confirmation. Tenn. Comp. R. & Regs. 1660-01-34-.01. A county earned the designation of "positive CWD" upon confirmation that a cervid tested positive for CWD within the territorial boundaries the county. A county earned the designation of "high risk CWD" upon confirmation that a cervid tested positive for CWD within ten (10) miles of the territorial boundaries the county. According to the emergency response plan, the TWRA used IHC to confirm results.

17. This same regulation obligated the TWRA to publish a map of these counties. Two other regulations, adopted at the same time, restricted the transfer of wildlife carcasses, parts, and products from positive CWD counties and high risk CWD counties. Tenn. Comp. R. & Regs 1660-01-34-.02, .03.

18. Shortly after the emergency response, due to the high volume of detections in the counties where CWD was originally detected and due to the cost and time associated with confirmatory testing, the TWRA decided to only use IHC confirmation for ELISA "suspect positives" received from counties that had not been previously confirmed and did not require confirmation per Regs 1660-01-34.01.

19. From 2016 until his termination, Mr. Kelly reviewed and processed all CWD diagnostic lab results with the exception of results received while Mr. Kelly was on leave. During his employment with the TWRA, nobody at the TWRA knew more about the CWD diagnostic lab results than Mr. Kelly.

20. For three seasons, the TWRA sent suspect positives for IHC confirmation if the suspect positive came from non-confirmed counties. The TWRA also sent suspect positives results for IHC confirmation if they were obtained in confirmed counties within 10 miles from a previously uncategorized county. The TWRA only reported counties as confirmed positive if the ELISA results were confirmed by IHC.

21. All diagnostic tests have imperfect detection, but the IHC method is universally referred to as the "gold standard" diagnostic test for CWD. It is the standard by which all other CWD diagnostic tests are evaluated. The American Association of Fish and Wildlife Agencies developed a technical report on best management practices for state agencies to guide the state wildlife agencies in CWD surveillance, prevention, and management. The report says of the ELISA test, "[t]ypically, the tests have a similar sensitivity to IHC but [can] and will occasionally produce positive results that cannot be confirmed by IHC." It also states that "[a]ll suspect positive ELISA test and Western blot test results should be confirmed with IHC (The Gold Standard test)."

22. Both ELISA and IHC will detect CWD in the late stages of infection and return "strong" positives.

23. In December of 2020, the TWRA received a suspect positive from Crockett County. It was sent for IHC confirmation and returned "not detected." As a result, the TWRA did not report Crockett County as a confirmed county pursuant to Tenn. R. & Regs. R. 1660-01-34-.01. Afterward, Dr. Dan Grove ("Dr. Grove"), who acts as the TWRA's Wildlife Veterinarian, began advocating that the TWRA stop using IHC to confirm suspect positives. Under his proposal, suspect positives results using the ELISA tests would not be sent for confirmation using IHC.

24. In February of 2021, the TWRA moved Mr. Kelly from his position as the Deer Management Program Leader to a new position as a wildlife data scientist. Aside from requiring him to train a new Deer Management Program Leader, the change in title did not change Mr. Kelly's job responsibilities up until the time he was terminated.

25. In September of 2021 the TWRA received a suspect positive result from Henry County, a non-confirmed county that was not contiguous to any other confirmed counties at that point. The sample for this result was collected from a deer who was believed to be showing symptoms consistent with CWD. However, the ELISA suspect positive was very weak. Following this result, the TWRA adopted Dr. Grove's proposal as its new protocol, and the TWRA did not, at this time, send the suspect positive from Henry County for IHC confirmation. However, the TWRA issued a press release that Henry County was now a confirmed CWD county.[1] Due to the proximity of the suspect positive to the border, the Kentucky Department of Fish and Wildlife activated its CWD response plan.[2]

26. On November 7, 2021, the TWRA added Gibson County as a positive and added Carroll County as high risk.[3] On December 1, 2021, the TWRA added Weakley County as a positive. On December 7, 2021, the TWRA added Crockett County as a positive and Dyer County as high risk.[4]

27. The TWRA used two diagnostics laboratories for ELISA testing during the 2021 season: The Mississippi State University Veterinary Diagnostics Laboratory and the C.E. Kord Animal

---

[1] Upon information and belief, this press release has been removed from the TWRA website.
[2] https://fw.ky.gov/News/Pages/Kentucky-activates-Chronic-Wasting-Disease-Response-Plan-following-Tennessee-detection.aspx
[3] https://www.tn.gov/twra/news/2021/11/19/cwd-positive-deer-found-in-gibson-and-mcnairy-counties.html
[4] https://www.tn.gov/twra/news/2021/12/10/hardin-and-dyer-counties-high-risk-for-cwd-and-crockett-county-now-positive.html

Health Diagnostic Lab ("Kord Lab"). The additions of Henry, Gibson, Weakly, Crockett, and Henderson counties as confirmed positives and Carroll and Dyer counties as high risk were the result of ELISA testing results received from Kord Lab.

28. At this point, Mr. Kelly told his supervisor, Stephanie Karns, and Dan Grove that he suspected an error at Kord Lab; too many counties were being added and way too fast. The number of samples sent for testing was 85% fewer than the highest year for sampling ever. However, the TWRA had added four times as many positive counties and twice as many high risk counties based on a relatively small number of sample from Kord Lab.

29. On December 9, 2021, the TWRA received results from Kord Lab showing four suspect positives in three non-contiguous counties in East Tennessee: Jefferson, Hawkins, and Claiborne. Under its new protocol and Regulation 1660-01-34-.01, the TWRA should have added these counties as confirmed counties, just like it did for Henry, Gibson, Crockett, and Weakley. However, the TWRA realized that these results were likely false, and the TWRA decided not to report Jefferson, Hawkins, and Claiborne counties as positive CWD.

30. In response to the suspect positive results from the non-contiguous East Tennessee counties, the TWRA sent the four suspect positive results from East Tennessee for IHC confirmation at Colorado State University ("CSU") even though IHC confirmation was not required under the TWRA's new protocol. The TWRA received results from CSU on the evening of December 15, 2021 that all four were "not detected." The TWRA relied upon these IHC test results and decided not to report these East Tennessee counties as positive CWD.

31. On December 16, 2021, the TWRA received a suspect positive from Henderson County, which would require reporting Henderson County as a confirmed positive and a second Henry County suspect positive that would require reporting Benton County as high risk. Again, the

TWRA chose not to at that time. This violated the TWRA's new protocol and/or Regulation 1660-01-34-.01. Nine-months later the TWRA added Henderson County as a positive CWD county without issuing a press release.

32. At this point, the TWRA had circumstantial evidence to question the accuracy of the suspect-positive ELISA test results from Kord Lab that changed the status of Henry, Gibson, Crockett, and Weakley counties to positive CWD. This evidence included the increased rate at which suspect positive ELISA results were coming from Kord Lab and the IHC results that found CWD was "not detected" in four samples from three East Tennessee counties.

33. On December 17, 2021, Mr. Kelly sent an email to his supervisor Stephanie Karns that identified nine lab results from Kord that changed or could change the status of counties to either "positive CWD" or "high risk":

    1. Henry County R12213984
    2. Weakley County R12203360
    3. Crockett County R12203379
    4. Gibson County 12203964
    5. Madison County R12203422
    6. McNairy County R12213670
    7. McNairy County R12210079
    8. Henry County R12216979
    9. Henderson County R12216978

He explained that in the year prior they had two status changing results from twice as many samples.

34. On December 20, 2021, Mr. Kelly met with Ms. Karns, Joe Benedict, Dan Grove, Joy Sweaney, and Sonia Mongold to discuss the discrepancies in lab results. It was decided to send the suspect positive ELISA samples from Kord lab for IHC testing identified in paragraph 27 above. In addition, the TWRA decided to send status-changing suspect positive

10

ELISA samples received from the MSU lab for IHC confirmation also. Those samples were sent to the National Veterinary Services Laboratory ("NVSL") in January of 2022.

35. On January 11, 2022, 0% of the test results from Kord Lab were confirmed on IHC. Soon after, 100% of the test results from MSU were confirmed on IHC.

36. In short: (1) Tennessee Regulations required that the TWRA report to the public if a county had a lab result confirmed as positive for CWD; (2) for three years, the TWRA defined "confirmed positive" to mean a suspect positive that had been confirmed using IHC; (3) in 2021, the TWRA changed its definition of "confirmed positive" by no longer requiring a suspect positive to be confirmed using IHC; (4) however, within months of changing the definition, the TWRA chose to apply its protocol inconsistently by reporting some "suspect positive" results as confirmed (Henry, Gibson, Crockett, and Weakley) and not reporting others (Jefferson, Hawkins, and Claiborne); (5) furthermore, the TWRA decided to rely upon "not detected" IHC results for three counties that had not been reported yet, but decided not to rely upon "not detected" IHC results for four counties that had already been reported.

37. A suspect positive on ELISA not being confirmed on IHC is a very rare event. According to peer-reviewed literature and in TWRA's experience prior to the 2021 season, IHC will confirm suspect positives on ELISA 92% – 94% of the time.

38. As a result of these inconsistent results, Stephanie Karns, Mr. Kelly's supervisor at the time, requested that Kord Lab provide the TWRA with all of the raw data from its CWD testing efforts during the 2021-22 season. Ms. Karns asked Mr. Kelly to compile, format, and analyze the data to determine the cause of the erroneous results. Mr. Kelly created visualizations of the well plates to determine the location of the suspect positive samples relative to other samples. He discovered that 100% of the status changing suspect positive results in question

were weak positives adjacent to strong positives on the well plates. The strong positives were from counties with previously confirmed positives and a substantial county-wide CWD prevalence rate. This was unambiguous evidence that strong positive samples contaminated adjacent samples changing them from "not detected" to "suspect positive." It explained the dramatic increase in suspect positives results and suspect positives results from non-contiguous counties in East Tennessee. In other words, the TWRA had clear unequivocal evidence that it had falsely reported counties as confirmed positive for CWD.

39. On March 28, 2022, Stephanie Karns, Joe Benedict, and Mr. Kelly briefed Jason Maxedon, Bobby Wilson, and Chris Richardson on these findings. Up until this point, Mr. Kelly was told that the TWRA wanted to be transparent about these issues when the time was right, and he believed that the TWRA was going to publicly announce the errors on the positive CWD and high risk CWD designations along with a corrected map.

40. The TWRA approached Kord Lab about Mr. Kelly's findings, and Kord Lab responded that the TWRA should have performed IHC confirmation before announcing status changing results.

41. On April 23, 2022, Mr. Kelly was accidentally shot during a hunting accident. During Mr. Kelly's recovery from his hunting accident, Executive Director, Bobby Wilson, announced his retirement, Assistant Director, Chris Richardson, was fired, and Assistant Director, Jason Maxedon, was appointed as the new Executive Director.

42. While Mr. Kelly was recovering from his injury, the TWRA drafted a new testing protocol for CWD testing. This protocol was to become effective in August of 2022, and it allowed for the use of subjective criteria (such as clinical signs of CWD, proximity to CWD-positive locations, etc.) to confirm ELISA "suspect" test results from samples originating outside "the

CWD-affected area." According to the TWRA, "Research now indicates that ELISA will return all the needed results ... [r]esearch now shows that a not detected or 'Negative' IHC result does <u>not</u> mean that the initial ELISA result was incorrect." (emphasis in original). This new protocol also created a new designation called "suspect non-confirmed." A true and accurate copy of this new protocol is attached as Exhibit 3.

43. Upon information and belief, no other state wildlife agency in the United States uses a testing protocol that implements ELISA without using IHC to confirm suspect positives in counties where CWD has not yet been detected.

44. The TWRA developed this protocol without involving, including, or otherwise notifying Mr. Kelly. Prior to investigating the discrepancies from Kord Lab and reporting them as requested by his supervisors, Mr. Kelly had been included in CWD team meetings and involved in policy decisions. When the TWRA finalized the protocols, Stephanie Karns included Mr. Kelly on the email to the group thanking them for their efforts. However, Mr. Kelly had not been included in the discussions on the protocol.

45. While Mr. Kelly was recovering from his injury, the Tennessee Fish and Wildlife Commission held a meeting where Dr. Grove reported on the status of CWD to the Commission. When asked whether suspect-positives from Henry and Weakley counties had been sent for IHC confirmation, Dr. Grove said they had. However, when asked what the results of those tests were, he told the Commission he could not recall. Shortly afterward, the request was made by a commissioner to go into executive session.

46. In addition to changing the testing protocol, the TWRA also proposed a change to Tenn. R. & Reg. 1660-01-34-.01. With the new regulation, which the Tennessee Fish & Wildlife Commission adopted, the TWRA no longer characterizes Henry, Weakley, Gibson or

13

Crockett counties as "confirmed" or "suspect not-confirmed." Now, these counties have been grouped into an undefined "CWD Management Zone." While a positive test for CWD in a county adjacent to the CWD Management Zone shall result in the county being included in the CWD Management Zone, a positive test for CWD in a county not contiguous to the CWD Management Zone, such as Jefferson, Hawkins, or Claiborne counties, means that the county may result in the creation of a new CWD Management Zone.

47. The changing of testing protocol, the creation of the designation "suspect not-confirmed," and the change in Tenn. R. & Reg. 1660-01-34-.01 covered up the inconsistent results and exempted any county in the designated area from needing confirmation. It also allowed the TWRA to avoid having to admit to its previous error and redesignate Henry, Weakley, Gibson, Crockett, and Henderson counties. Further, it allowed the TWRA to include these counties in the CWD Management Zone without needing to explain whether any of those counties were in fact CWD positive. The regulations also allowed the TWRA the discretion to choose whether a CWD positive from a non-contiguous county should result in a change in designation. This allowed the TWRA to explain why it chose not to include Jefferson, Hawkins, or Claiborne counties as positive CWD counties.

48. In other words, rather than respond to the discrepancies in CWD testing results by following its rules and protocols, the TWRA changed the rules and protocols to avoid having to admit its mistakes.

49. The TWRA has stated that the designation of "suspect not-confirmed" is intended to provide hunters with more transparency regarding testing results. However, the TWRA has never disclosed to the public that the test results from Weakley, Henry, Crockett, Gibson, and, in September of 2022, Henderson counties that resulted in the change of designation to positive

14

CWD (and now inclusion within the CWD Management Zone) could not be confirmed on IHC.

50. Furthermore, the TWRA inconsistently applied its testing protocol in 2021 by picking and choosing what tests were necessary to confirm samples as being positive for CWD. Weakley, Henry, Crockett, Gibson, Henderson, Hawkins, Claiborne, and Jefferson counties all had suspect positive ELISA results and not-detected IHC results. However, the TWRA chose to treat them differently.

51. The TWRA made this decision to treat these counites differently despite the overwhelming evidence that none of the samples tested from these counties were positive for CWD.

52. Mr. Kelly and others at the TWRA expressed their concerns about the TWRA's inconsistent treatment of the test results from these counties. On August 15, 2022, Mr. Kelly communicated with Joe Benedict and "strongly advised against adopting [the new CWD testing protocol] without further internal deliberations where all the facts are shared open and honestly amongst relevant staff. So far this has not happened. I have made this same request to Steph, but it seems that request was denied."

53. Rather than share the facts internally, the TWRA held a mandatory meeting and invited Dr. Aaron Lehmkuhl to explain the differences in ELISA and IHC testing. TWRA staff that were invited to the meeting were told not to provide facts regarding the TWRA's test results and to only ask questions regarding the two tests.

54. Dr. Lehmkuhl did not state that ELISA testing results alone should be used to confirm the presence of CWD. Dr. Lehmkuhl did not advise that the use of subjective criteria was appropriate for evaluating whether a suspect positive on ELISA should be confirmed as CWD

15

or not. Dr. Lehmkuhl's statements discredited the TWRA's new protocol and its treatment of the discrepancies in test results.

55. After the meeting with Dr. Lehmkuhl, Stephanie Karns and Joe Benedict instructed Mr. Kelly to stop talking about the TWRA's treatment of the results and the new testing protocol.

56. On September 6, 2022, Mr. Kelly wrote a memo to the Tennessee Fish and Wildlife Commission. A true and accurate copy of this memo is attached as Exhibit 4.[5] The Memo disclosed the facts regarding the TWRA's violations of 1660-01-34-.01, and it requested the reinstatement of the IHC confirmation protocol, testing of the Dyer County ELISA suspect, and publication by the TWRA of a corrected map of positive and high risk CWD counties. Mr. Kelly authored the Memo as an employee of the TWRA, a Certified Wildlife Biologist®, and as a concerned citizen.[6] However, as the very first sentence of the Memo makes clear, Mr. Kelly never represented that his letter was an official statement representing the position of the TWRA. Immediately, the TWRA sent officers to Mr. Kelly's house to hand-deliver a letter placing him on Discretionary Leave with Pay. A true and accurate copy of this letter is attached as Exhibit 5. The letter indicated that Mr. Kelly was "being placed on leave pending the outcome of an internal investigation."

57. Mr. Kelly complied by turning over his cell phone, keys, and laptops. He also complied with the TWRA's request that he not report for duty or attend any agency function. On September

---

[5] Since his memo, Henderson County has been added to the map without the TWRA issuing a press release. This is the first time the TWRA has added a county to the map without a press release.
[6] As a certified wildlife biologist, Mr. Kelly was obligated to follow code ethics that prohibit the suppression of lab results.

16

8, when the TWRA called him in for an immediate interview, he complied with the request and signed a Garrity Warning.[7]

58. The TWRA sent an email to everyone who received Mr. Kelly's memo. The memo accused Mr. Kelly of spreading misinformation. The memo stated that "[a] full investigation will be conducted." However, the TWRA did not conduct an investigation of the information in Mr. Kelly's memo.

59. For over a month, the TWRA failed to communicate with Mr. Kelly regarding either the status of its investigation or his employment. During that time, the TWRA did not investigate the allegations of Mr. Kelly. Instead, the TWRA investigated how to perform Mr. Kelly's job without him. Similarly, during the time Mr. Kelly was on discretionary leave, Mr. Maxedon did not investigate whether the September 6, 2022, memo by Mr. Kelly created any disruption with the TWRA's services, programs, or operations. In fact, the only disruption to the TWRA that resulted from the September 6, 2022, memo was the period of time when the TWRA put Mr. Kelly on discretionary leave to determine how to perform his job without him.

60. On October 17, 2022, Jason Maxedon, Director of the TWRA, terminated Mr. Kelly. The termination letter from October 17, 2022 proves that Mr. Kelly refused to participate in and refused to remain silent about TWRA activities. It proves that the sole basis for TWRA's termination was Mr. Kelly's refusal to participate in and remain silent about those activities. A true and accurate copy of the letter is attached as Exhibit 6.

61. After terminating Mr. Kelly, the TWRA contacted the Southeastern Cooperative Wildlife Disease Study ("SCWDS") for guidance on how agencies interpret and respond to inconclusive or conflicting chronic wasting disease diagnostic test results. On January 30,

---

[7] Shawn Karns, husband of Mr. Kelly's then boss Stephanie Karns, conducted the interview.

2023, SCWDS responded but did not recommend relying solely upon ELISA suspect positive test results to designate counties as CWD positive where CWD was not known to be present. However, that is exactly what the TWRA had done with Henry, Gibson, Weakley, and Crockett counties. A true and accurate copy of that letter is attached as Exhibit 7.

62. The only logical conclusion from the SCWDS response to the TWRA is that should not have reported Henry, Gibson, Weakley, and Crockett counties. However, the TWRA failed to make any effort to correct its report of these counties and, in fact, moved forward with the change in regulations that designated these counties as part of the CWD Management Zone.

## COUNT I – TENNESSEE PUBLIC PROTECTION ACT

63. Kelly incorporates the previous allegations as if restated herein.

64. The termination violated Tenn. Code Ann. § 50-1-304, also known as the Tennessee Public Protection Act ("TPPA").

65. Under the TPPA, Mr. Kelly qualified as an "Employee"[8] and the State of Tennessee, via its agency the TWRA, qualified as an "Employer."[9] Tenn. Code Ann. § 50-1-304.

66. The TPPA prohibited the TWRA from discharging or terminating Mr. Kelly "solely for refusing to participate in, or for refusing to remain silent about, illegal activities." Tenn. Code Ann. § 50-1-304(b).

67. "Illegal activities" is defined by the TPPA as "activities that are in violation of the criminal or civil code of this state of the United Sates or any regulation intended to protect the public health, safety, or welfare." Tenn. Code Ann. § 50-1-304(a)(1)(3)(A).

---

[8] An "Employee" includes "[a] person employed by the state or any … agency … of the state." Tenn. Code Ann. § 50-1-304(a)(1)(A).
[9] An "Employer" includes "[t]he state or any … agency … of the state." Tenn. Code Ann. § 50-1-304(a)(2)(A).

68. The "Rules and Regulations for Chronic Wasting Disease Counties" were adopted pursuant to Tenn. Code Ann. § 70-1-206(a)(4), which authorize the Tennessee Fish and Wildlife Commission to "establish objectives within the state policy that will enable the wildlife resources agency to develop, manage and maintain sound programs of hunting, fishing, trapping and other wildlife related outdoor recreational activities." Pursuant to this authority, the Tennessee Fish and Wildlife Commission adopted rules and regulations related to stemming the spread of CWD.

69. The regulations, like the emergency response, were intended to protect public health, safety, and welfare, and they implicate "important public policy concerns."

70. It cannot be disputed that the TWRA violated this regulation at the time of Mr. Kelly's memo. It also cannot be disputed that Mr. Kelly had a reasonable, good-faith belief that the TWRA violated the regulation.

71. The TWRA was obligated by a regulation to report to the public counties with confirmed cases of CWD in response to growing concern of the spread of CWD in Western Tennessee. The TWRA obtained credible evidence that it had incorrectly reported four counties as having confirmed cases of CWD.

72. Incorrectly reporting the spread of CWD can have an economic impact on the counties were CWD is reportedly found, and it can have an impact on a state wildlife agency's use of funds and resources.

73. For example, the report by the TWRA that Henry County was positive CWD resulted in the State of Kentucky commencing its CWD emergency plan. This report was based upon a weak suspect positive on ELISA that, if the deer was symptomatic for CWD, should have been a strong suspect positive. The sample was confirmed to be not detected by IHC. At

19

this point, the TWRA had the option of either correcting its errors or covering them up. The TWRA chose to cover them up with new protocols and new regulations. As a result, counties, like Henry County, without confirmed cases and counties with cases that were confirmed to be not detected have now been grouped with counties where CWD has been confirmed. This decision allows deer carcasses from IHC-confirmed CWD counties to be transported into counties without confirmed cases, which could expedite the spread of CWD across West Tennessee.

74.     In addition, the TWRA violated the regulation by not reporting suspect-positives from East Tennessee. If the TWRA applied its protocol consistently, Jefferson, Hawkins, and Claiborne would be reported as confirmed counties. Rather than follow its regulation and its protocol, the TWRA decided to rewrite both. This is also a violation of the regulation.

75.     The TWRA failed to follow the regulation regardless of how it defined "confirmed positive." The TWRA reported some suspect positives as "confirmed" and failed to report others. It sought confirmation of the suspect positives using IHC, a step it previously decided was unnecessary for reporting confirmation. All of the suspect positives came back "not detected," and Mr. Kelly provided an unassailable explanation for why: contamination. However, even if the TWRA decided not to accept that the samples were contaminated and even if the TWRA decided not to accept the results of the IHC confirmation, the TWRA still reported suspect positive results inconsistently and continues to do so. Furthermore, to avoid having to admit its mistake to the hunters and counties of Tennessee and Kentucky, the TWRA changed the regulation.

76. The TWRA has acknowledged that Mr. Kelly reported and refused to remain silent about an activity that he believed was illegal. Maxedon has emphasized that he terminated Mr. Kelly solely because of his reporting of this activity.

77. As a result of the TWRA's violation of the TPPA, Mr. Kelly suffered lost back and future wages, embarrassment and humiliation, damage to his professional reputation, anxiety and stress, as well as costs and attorneys' fees.

78. Based upon the Tennessee Fish & Wildlife Commission going into executive session after Dr. Grove was asked about the results of IHC confirmation from Henry, Gibson, Crockett, and Weakley counties, Mr. Kelly had reason to believe that the Commission may have knowledge of the TWRA's efforts to cover up with results. As a result, Mr. Kelly was justified in reporting the TWRA's actions to non-governmental organizations.

### COUNT II – TENN. CODE ANN. § 8-50-116

79. Mr. Kelly incorporates the previous allegations as if restated herein.

80. The General Assembly of the State of Tennessee has made it perfectly clear that it encourages state employees: "to report verbally or in writing to their supervisor, department head, or other appropriate authority or entity, evidence of activity by a state agency or state employee or state contractor constituting violations of state or federal law or regulations, fraud in the operations of government programs, misappropriate of state or federal resources, acts which endanger the health or safety of the public or employees and mismanagement of programs, funds, or abuses of authority." Tenn. Code Ann. § 8-50-116(a)(1).

81. Tenn. Code Ann. § 8-50-116 protected Mr. Kelly from termination because he reported the TWRA's violation of a state regulation and its attempt to cover up the violation.

21

82. Tenn. Code Ann. § 8-50-116 also protected Mr. Kelly from termination for reporting the TWRA's efforts to cover up the diagnostic test results based upon lab error.

83. Tenn. Code Ann. § 8-50-116 also protected Mr. Kelly from termination because he had a reasonable, good-faith belief based upon facts that the TWRA engaged in fraud and mismanagement of its CWD program by failing to disclose diagnostic test results that contradicted the TWRA's reporting of counties as positive CWD, inconsistently reporting diagnostic test results, changing testing protocols to respond to discrepancies in diagnostic test results, and proposing new rules and regulations that would avoid the need to correct any errors in diagnostic test results for Henry, Gibson, Weakley, and Crockett counties.

84. By sending his memo on September 6, 2022, Mr. Kelly reported to the Tennessee Fish & Wildlife Commission that the TWRA had failed to follow its obligations under Tenn. R. & Reg. 1660-1-34-.01.

85. By sending his memo on September 6, 2022, Mr. Kelly reported to the Tennessee Fish & Wildlife Commission that the TWRA committed fraud by concealing diagnostic test results and changing protocols to allow it to deny the importance of those results.

86. By sending his memo on September 6, 2022, Mr. Kelly reported to the Tennessee Fish & Wildlife Commission that the TWRA was mismanaging resources and programs to monitor and contain CWD in Tennessee.

87. The September 6, 2022, memo was not fraudulent or dishonest. The September 6, 2022, memo did not willfully disregard the truth or falsity of any information it contained. The facts in the September 6, 2022, memo are accurate regardless of whether the TWRA agrees with the conclusions drawn from the facts.

22

88. "No head of any state department, agency or institution, state employee exercising supervisory authority, other state employee or state contract shall recommend or act to discharge, demote, suspend, reassign, transfer, discipline, threaten or otherwise discriminate against a state employee … because the employee … reports or attempts to report, verbally or in writing: (A) The willful efforts of such person or agency or contractor to violate a state or federal, rule or regulation which had or would have had a material and adverse effect upon program operations or program integrity, or the willful efforts to conceal such a violation." Tenn. Code Ann. § 8-50-116(b)(1).

89. Despite the protections of Tenn. Code Ann. § 8-50-116, Mr. Maxedon terminated his employment.

90. Mr. Maxedon terminated Mr. Kelly as a result of Mr. Kelly's exercise of his rights under Tenn. Code Ann. § 8-50-116.

91. Mr. Maxedon's termination of Mr. Kelly was not pursuant to any lawful state order.

92. Mr. Maxedon's termination of Mr. Kelly did not result from Mr. Maxedon's good faith interpretation of any rule or regulation.

93. Rather, Mr. Maxedon's retaliation was malicious and willful. For example, after Mr. Kelly reported his concerns, Mr. Maxedon ordered that law enforcement go to his house to recover TWRA property. Mr. Maxedon then ordered that Mr. Kelly return to TWRA headquarters where he was questioned by law enforcement for hours. Then, after authoring the termination letter, Mr. Maxedon blamed Mr. Kelly's division management for the termination when it was really Mr. Maxedon who made the decision.

94. Furthermore, the TWRA sought consultation with SCWDS about the very subject that Mr. Kelly had reported. The TWRA sought this consultation in response to refusal to

23

remain silent about the TWRA's illegal activities. However, the TWRA did not seek this consultation during Mr. Kelly's employment or while he was on discretionary leave. Rather, the TWRA terminated Mr. Kelly first.

95. Any employee harmed by such a violation may recover actual damages, back wages, and attorneys' fees. Tenn. Code Ann. § 8-50-116(c), (d)(1). If there is a finding of a willful or malicious violation, the court may award damages up to three times the actual damage plus costs and attorney's fee against the individual or individuals found to be in violation. Tenn. Code Ann. § 8-50-116(d)(3).

96. As a result of Mr. Maxedon's malicious and willful retaliation against Mr. Kelly, Mr. Kelly is entitled to treble actual damages resulting from the violation of Tenn. Code Ann. 8-50-116.

97. As a result of Mr. Maxedon's violation of Tenn. Code Ann. § 8-50-116, Mr. Kelly suffered lost back and future wages, embarrassment and humiliation, damage to his professional reputation, anxiety and stress, as well as costs and attorneys' fees.

98. State employees shall also be "free of intimidation or harassment when reporting to public bodies about matters of public concern," and public servants best serve the citizens when they can be candid and honest *without reservation* in conducting the public's business." Tenn. Code Ann. § 8-50-116(a)(2), (a)(3).

99. Mr. Kelly was also subjected to intimidation and harassment for reporting to the Tennessee Fish & Wildlife Commission. At the direction of Mr. Maxedon, the TWRA sent law enforcement to Mr. Kelly's house to recover TWRA property. The TWRA called him into its office where law enforcement, including the husband of his then-supervisor, asked him for questions for hours. The TWRA sent an email to everyone that received Mr. Kelly's

memo. The email discredited his conclusions by saying "he has no formal experience or certification in diagnostics," despite the fact that his supervisors asked him to investigate lab error and report it to the executive director. The email also accused Mr. Kelly of spreading "misinformation," despite acknowledging the examples used in the memo were "factually accurate." These actions, and others, demonstrate that the TWRA engaged in willful and malicious retaliation against Mr. Kelly as a direct response to his protected activity.

## PRAYER FOR RELIEF

WHEREFORE, premises considered, Plaintiff prays for a judgment and requests that this Honorable Court grant relief as follows:

A. That service of process issue to the Defendants as required by law, and Defendants be required to appear and answer this Complaint;

B. For compensatory damages, including, but not limited to, damages for permanent and irreparable harm, emotional distress, humiliation, embarrassment, loss of earnings, loss of future earning power, loss of back pay and front pay, and interest due thereon, as well as additional costs incurred;

C. For punitive damages;

D. For reasonable attorneys' fees, costs and interests;

E. For treble damages;

F. For a jury to hear this matter; and

G. For any such other and further relief to which Plaintiff may be entitled by law.

**JURY TRIAL DEMANDED**

25

Respectfully submitted,

**ORTALE KELLEY LAW FIRM**


/s/ T. William A. Caldwell
T. William A. Caldwell (#27130)
Attorney for Plaintiff
330 Commerce St., Suite 110
P. O. Box 198985
Nashville, TN  37219-8985
(615) 256-9999
wcaldwell@ortalekelley.com